UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| Kenneth W. Petersen, Jr., | Civil Action No. 5:22-cv-5064 |
| Plaintiff, | |
| vs. | **PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR** |
| Rapid City, Pierre & Eastern Railroad, Inc. | **PARTIAL SUMMARY JUDGMENT** |
| Defendant. | |

## I.      Statement of material facts

Petersen submits this statement of material facts as required by LR 56.1(A).

### The catastrophic derailment

1.      In the early morning of August 2, 2019, Plaintiff Kenneth Petersen was working as a conductor for Defendant Rapid City, Pierre & Eastern Railroad, Inc. (RCPE). (Ex. A at 63:18:21.) He was working on a two-person crew with engineer Michael Hendrickson, operating an eastbound train out of Rapid City. (Ex. A at 63:23-64:17.)

2.      Hendrickson and Petersen reported for work around 1:00 a.m. and departed on a train with 54 total cars, with a gross weight of over 1.4 million pounds, around 2:00 a.m. (Ex. A at 63:20-21, 71:14-17; Ex. K.)

3.      Hendrickson and Petersen were not furnished with a weather report or weather alert prior to starting work on that day. (Ex. A at 67:11-13.)

4.      Unbeknownst to Hendrickson and Petersen, heavy rains had washed out the supporting ballast and ties at a culvert that ran underneath a section of track near New Underwood, South Dakota. (Ex. B at 17:22-18:1.) The washout meant that the track was left in place, but the

earthworks and track supporting the rail were undermined by flowing surface runoff from the rains and significantly weakened. (Ex. B at 17:22-18:1.)

5.      The site of the washout and eventual derailment was "a descending hill" around mile post 622.75 where the train "come[s] around a corner towards the top of the hill and then you have . . . anywhere from [a] three-quarter to a one-mile stretch and then there's another curve," and the derailment location "is closer down to the bottom of the hill just before the curve." (Ex. A at 69:15-20, 72:5-8.)

6.      The train was traveling at a speed-limited rate of about 25 miles per hour (based on the speed limit in that segment of track, not on a slow-down warning) just prior to the time of the derailment. (Ex. A at 72:9-13.) Hendrickson was increasing speed out of the speed-limited section at the time of the derailment and estimated that his speed at the time of derailment was 28 to 30 miles per hour. (Ex. A at 73:11-16.)

7.      Up until immediately before the derailment, Hendrickson and Petersen did not notice anything out of the ordinary. (Ex. A at 74:21-23; Ex. N at 65:15-16.) It was dark at the time, and visibility from the locomotive headlights was limited to "a few hundred yards" and probably less than a quarter mile. (Ex. A at 74:1-20.)

8.      About 200 to 250 yards away from the washout, Hendrickson first saw the hazard. (Ex. A at 76:13-20.) He had been looking down to monitor the gauges for a few seconds and saw the washout when he looked up. (Ex. A at 76:21-77:3.)

9.      When he saw the washout, Hendrickson "cussed" and "grabbed the air brake handle" because he "knew it was the only thing [he] could do." (Ex. A at 77:6-23.) He was unsure if he was able to brake the train at all before the derailment. (Ex. A at 77:24-78:3.) He "cussed and

told [Petersen] to hold on." (Ex. A at 78:9-11.) Petersen also saw the washout shortly before the train derailed. (Ex. N at 66:25-67:16.)

10.     When the lead locomotive passed over the critically weakened portion of track at the washout, just before 3:00 a.m., it derailed.[1] (Ex. B at 9:2-7.) Anthony White, the sheriff's deputy who was the first responder on the scene, testified that he "could tell that as the train drove across this gap where there was no longer a track bed and it kind of listed to its right side and impacted the bank on the far side." (Ex. B at 17:22-18:1.)

11.     When the locomotive hit the washout, Hendrickson recalled:

> All I remember is the first bang. I felt the nose drop and like slam into the other side of the wash, I guess. And then I remember—from there I remember kind of rising up and going on our side and then the second—the second that it slammed into the ground. And that's all I really remember about it.

(Ex. A at 80:10-15.)

12.     The lead locomotive in which Hendrickson and Petersen were working derailed and travelled about 300 yards and tipped onto its right side. (Ex. A at 81:1-15.)

13.     RCPE has not put forth any expert evidence that Hendrickson or Petersen could have stopped the train in time to avoid the derailment, given the weather conditions, visibility, train weight, and speed at the time of the derailment.

14.     The nature and extent of Petersen's injuries are matters for trial, but there is no dispute that Petersen suffered serious injuries as a result of the derailment. Petersen was thrown from his chair and suffered what he believed to be a broken back. (Ex. N at 80:16-19.) He was

---

[1] Hendrickson placed the time of the derailment at around 3:30 or 3:45 a.m. (Ex. A at 73:20-24), but the time of the 911 call (2:57 a.m.) is a more accurate marker of when the derailment occurred. (Ex. B at 9:2-7.) Gary Howie testified that he heard the screeching noise of the train's brakes and called 911 immediately after a neighbor went out to investigate and saw the derailment, which would place the derailment minutes before 2:57 a.m. (Ex. E at 13:18-14:7.)

trapped in the locomotive for around four hours until he could be removed by rescue workers. (Ex. A at 100:14-17; Ex. B at 22:3-7.)

15.     Petersen was eventually removed from the locomotive and taken by ambulance to a hospital, where he was diagnosed with lacerations and cracked ribs. (Ex. N at 91:25-92:10, 94:23-94:2.)

16.     RCPE admitted in an internal presentation that both Hendrickson and Petersen were injured as a result of the derailment: "locomotive engineer and conductor were injured[;] engineer received a couple broken ribs[;] conductor received a broken ankle."[2] (Ex. C at 18 (capitalization altered to read normally).)

**The track, culverts, and washout**

17.     At the time of the derailment, there was one 96-inch culvert at the derailment site. (Ex. D at 55:25-56:1, Ex. L at 103:1-3.) After the derailment, RCPE installed two additional 60-inch culverts at the site, bringing the total to three. (Ex. D at 55:25-56:1, Ex. L at 103:1-3.)

18.     The landowner whose property was adjacent to the site, Gary Howie, documented in a Facebook post (including photo) on May 31, 2019, about two months before the derailment, that water was pooling behind the ballast holding up the tracks. (Ex. E-11A.)

---

[2] It appears that the slideshow mistakenly switched the job roles that Hendrickson and Petersen were performing at the time of the derailment; Petersen, who broke his ribs, was the conductor.



19.     On the day of the derailment, Howie arrived on the scene shortly after the derailment and photographed the derailment and the water at the site. (Ex. E-1.)

20.     A sheriff deputy, Anthony White, was the first emergency responder on the scene. (Ex. B at 22:3-13.) Deputy White described the derailment site:

> When I got to where the actual crash site was there was no ballast. There was metal rails that were spanning this large gap, I would say probably 50 to 80 yards wide. The rails were connected from the left or from one end to the other, and then there were intermittent railroad ties still attached to the rails that spanned that gap. But the actual track bed or ballast, as you would say, was completely gone.

(Ex. B at 12:8-15.)

21.     Deputy White described the water situation at the derailment site:

> So the track bed itself kind of acted as sort of like a dam for a drainage field to the north of it. There was a single culvert that went underneath the track bed that accessed Box Elder Creek, which is one of the main flowing creeks in the area. From what I could tell, that north field had received so much water so fast that as it was rushing out the single culvert into Box Elder Creek, the area around the culvert just kind of washed out to the point where it just took the entire track bed with it. So all the water was flowing from the north going south, and then the creek itself

was flowing from east to west. So it was kind of like in the middle of a T by where
this water was flowing and that's right where this crash had occurred.

(Ex. B at 14:4-17.)

22.     After the derailment, Deputy White said: "The culvert was completely gone. There
was no culvert. It wasn't until I looked at satellite photos that I was able to kind of figure out what
had been there prior to my arrival." (Ex. B at 14:20-23.)

23.     The track structure washout was the cause of the derailment. An RCPE internal
presentation admitted: "Washouts derail[ed] 3 locomotives and 17 cars," that "12 total washouts
were discovered in a 5 miles [sic] stretch," and that "[w]aterway rose 12 feet where a bridge fill
occurred at derailment sight [sic]." (Ex. C at 18.)

24.     No RCPE manager or track inspector conducted an investigation into the causes of
the derailment or specifically why the track structure washed out and failed. (Ex. F at 63:13-14,
Ex. D at 45:15-19, 61:10:22; Ex. L at 88:12-23.)

25.     A piece of the existing culvert was damaged and removed during the remediation
of the site. (Ex. M at 38:16-22.) During an inspection of the site, Petersen's railway engineering
expert, Brian Hansen, asked to look at the piece of the culvert that was taken out and was told by
the roadmaster "that they had gotten rid of it." (Ex. M at 38:23-39:1.)

**The weather**

26.     The storm occurred the night before, at "around seven, eight, or nine o'clock." (Ex.
F at 34:7-10.)

27.     Gary Howie, the landowner, described the rainstorm:

We had a very unusual rain event. I think we had about six and a half inches of rain.
What literally happened is water was pooling up on the—right immediately north
of the house. And the culvert there was big enough so even though the water was
pooling up, it was coming through the pasture, then the culvert. We headed down
here to handle it. So it backed up, went over our driveway, and down into the
basement.

(Ex. E at 12:21-13:3.)

28.     The storm was a sustained, hours-long rainstorm that had multiple phases and placed more rainfall at the derailment site than the location typically receives in the entire month of August, and even more rainfall (estimated at 3 to 5.21 inches based on radar) immediately north of the derailment. (Ex. G at 15-16.)

29.     This same storm system prompted a flash flood watch that encompassed Pennington County, where the derailment site was located, at 1:50 p.m. on July 31, over a full day before the storm began. (Ex. G at 3-4.)

30.     The storm system generated three waves of significant rainstorms that moved in a southeasterly direction across RCPE's track near New Underwood from 6:43 p.m. on August 1 to 12:42 a.m. on August 2. (Ex. G at 4-7.)

31.     The storms prompted the National Weather Service in Rapid City to issue a flash flood warning, a subsequent update stating that up to three inches of rain had fallen, and a flood advisory in areas to the south and east of the derailment site at 10:41 p.m., 1:15 a.m., and 4:44 a.m. (Ex. G at 8-13.)

**RCPE's failure to inspect the tracks despite the storm**

32.     "Storm patrol" is a railroad job in which workers "go out ahead of the trains to make sure everything is okay for them to go over." (Ex. F at 35:4-11.) Storm patrol can be performed by track inspectors, section foremen, or roadmasters, depending on availability. (Ex. F at 36:1-7.)

33.     Track inspectors learned that they should conduct storm patrol through the roadmaster or sometimes the dispatcher. (Ex. F at 38:16-22.) Inspectors relied on roadmasters or

dispatchers to inform them of storm patrol because they would not necessarily know there was a storm in an area of their track. (Ex. F at 39:24-40:8.)

34.     RCPE's dispatch and management made the decision whether to send out storm patrol inspectors based on automated weather alerts generated from a system called SkyGuard (which is an AccuWeather product). (Ex. D at 47:22-12, 51:3-25; Ex. F at 34:16-22; Ex. H at 60:14-61:25.)

35.     Michael Kellar, an assistant general manager and acting roadmaster at the time of the derailment (Ex. D at 7:11-14, 8:15-17), was questioned about how the SkyGuard warnings worked and how dispatch and other railroad personnel acted upon them:

> Q. And who provides the SkyGuard warnings?
>
> A. It's—it's an AccuWeather. And it gets sent to, like, our ARDC dispatch center. And then they'll either call, like, the roadmaster or somebody in charge and notify them of the storm coming through and generally put the trains down to, like, a restricted speed.
>
> Q. Anything else that's required when Accuview [sic] contacts dispatch and dispatch contacts the roadmaster?
>
> A. Generally the roadmaster will send out an inspector after the storm has passed to assess the area or anything that were to happen.
>
> Q. And until the storm passes, the trains are reduced in their speed? [Defense counsel made a form objection.] Is that how it works?
>
> A. It depends. There's different circumstances, such as if there was severe weather, like, tornado, we'd stop the train instantly, that type of thing. If it's weather related, flash flood-type instances and—we run them at restricted so that they can stop short of anything. Or we'll send an inspector to get a look on the track ahead of them.

(Ex. D at 49:5-50:7.)

36.     Kellar testified that, on the night and early morning before the derailment, "nobody received any notifications of any weather-type events." (Ex. D at 47:22-48:1.)

37.     But around 90 minutes before the derailment, at 12:34 a.m. on Friday, August 2, 2019, RCPE received a "Flash Flood" warning, sent with "High" importance, relevant to mile markers 606.5 to 628.1, which encompassed the derailment site (roughly at mile 622.75). (Ex. I.)

38.     The warning said:

> Heavier rain is moving back into the area which has already seen 1.5-3 inches of rain over the last 3 hours. Look for an additional 1-2 inches to bring totals into the 2.5-5 inch range. Runoff will also move towards track from the north in this area, thus watch for high water near track, flash flood conditions and potential washouts!

(Ex. I.)

39.     Water moving to and pooling at the north end of the track was present at the derailment that occurred about 90 minutes after the SkyGuard alert was sent and not acted upon. (Ex. B at 14:4-17.)

40.     An internal slide show presentation describing the derailment admitted that "ARDC [dispatch] received a SkyGuard alert for a flashflood warning for the area but allowed the train to depart without notifying anyone of the alert or [sic] without restrictions. . . . Crew was on duty at 2330, departed at 0030[,] encountered heavy rain, zero visibility, and a washout, dispatcher tried to contact the train with no response, a local farmer's hand discovered the train and contacted authorities." (Ex. C at 18 (capitalization altered to read normally).)

41.     Although Jared Hook, the track inspector for the relevant segment of track at the time of the derailment, would usually "get a call for storm patrols," "no one got a call out that night." (Ex. F at 34:11-13.)

42.     "The dispatchers . . . have alerts come up on their computers saying where there's a storm at," and Hook, the track inspector, stated, "I don't know if that got missed or what, but . . . no one got a call out to go inspect track." (Ex. F at 34:16:22.)

43.     Between 7:00 p.m. on the night before the derailment, through the storm, and up to the derailment just before 3:00 a.m., Hook, the track inspector, said that "[n]o one got called out [to do storm patrol] that I can recall." (Ex. F at 44:1-10.)

44.     Despite the significant rainfall, no storm patrols were conducted in the area of the derailment until the next day, after the derailment. (Ex. F at 42:1-16.)

45.     Hook concluded that the storm patrol "should have been done the night before the train went out." (Ex. F at 60:12-17.)

46.     In 1997, the Federal Railroad Administration (FRA) issued guidelines about when railroads must inspect their tracks following significant rainfall. (Ex. J (FRA's Notice of Safety Advisory 97-1 (amended Nov. 10, 1997)) (hereinafter "Advisory 91-7")).[3]

47.     Among other guidelines, Advisory 97-1 warned railroads (1) that "washouts or water damage to culverts or subgrade not near a bridge" had caused several derailments because railroads failed to conduct adequate special inspections and (2) that railroads should put in place a procedure to receive flash flood warnings that might affect nearby track even if it is not in the warning area "in time to permit timely response." Advisory 97-1.

Dated:  August 1, 2023                LYNN, JACKSON, SHULTZ & LEBRUN, P.C.

                                      */s/ Jeffery D. Collins*
                                      Jeffery D. Collins
                                      909 Saint Joseph Street, Suite 800
                                      Rapid City, SD 57701
                                      (605) 348-342-2592
                                      jcollins@lynnjackson.com

                                      and

---

[3] Available at https://railroads.dot.gov/sites/fra.dot.gov/files/fra_net/2995/sa97_1.pdf.

HUNEGS, LENEAVE & KVAS, P.A.

Paul Banker
1000 Twelve Oaks Center Drive, Suite 101
Wayzata, Minnesota 55391
(612) 339-4511
(612) 339-5150 Fax
pbanker@hlklaw.com

ATTORNEYS FOR PLAINTIF

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the above Plaintiff's Statement of Material Facts was filed via CM/ECF on August 1, 2023 which sent electronic notice of filing to the following:

William G. Beck
Seth Lopour
Woods, Fuller, Shultz & Smith, P.C.
P.O. Box 5027
300 South Phillips Avenue, Suite 300
Sioux Falls, SD 57117-5027
bill.beck@woodsfuller.com
seth.lopour@woodsfuller.com

Chad M. Knight
William McFadden
Knight Nicastro MacKay, LLC
1401 Walnut Street, Suite 200
Boulder, CO 80302
knight@knightnicastro.com
mcfadden@knightnicastro.com

*/s/ Jeffery D. Collins*
Jeffery D. Collins