UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| KENNETH W. PETERSEN, JR.,<br><br>Plaintiff,<br><br>vs.<br><br>RAPID CITY, PIERRE & EASTERN R.R., INC.<br><br>Defendant. | 5:22-CV-5064<br><br>**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT AND MOTION FOR SANCTIONS AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Pending before the Court is a motion for partial summary judgment filed by Plaintiff Kenneth W. Petersen, Jr., a cross-motion for summary judgment filed by Defendant Rapid City, Pierre & Eastern Railroad, Inc. ("RCPE"), and Plaintiff's Motion for Sanctions. For the following reasons, these motions are denied.

## BACKGROUND

This is an action for damages under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51-60. Plaintiff Kenneth Petersen was injured in a derailment while working as a conductor for Defendant Rapid City, Pierre & Eastern Railroad, Inc. ("RCPE") near New Underwood, South Dakota. While Petersen (the conductor) and fellow RCPE employee Michael Hendrickson (the engineer) were operating a RCPE train eastbound out of Rapid City, their train encountered a section of washed-out track and derailed, causing both to suffer injuries. Plaintiff has initiated suit under FELA, as has Hendrickson in a related suit.

**A. Weather leading up to derailment**

At 1:50 p.m. MDT on Wednesday, July 31, 2019, the National Weather Service Rapid City issued a Flash Flood Watch for southwestern South Dakota including Pennington County where

1

the derailment occurred, effective the afternoon of Thursday, August 1, 2019, until late Thursday night. (Doc. 56-9). The Flash Flood Watch indicated that "abundant moisture combined with slow storm movement could produce very heavy rainfall and cause rivers and streams to rise quickly." (Doc. 56-9). On Thursday, August 1, 2019, around 10:41 p.m. MDT, the National Weather Service Rapid City issued a warning that "flash flooding was expected to begin shortly" in an area approximately 12.5 miles southeast of the incident site. (Doc. 56-9). A short time later, on Friday, August 2, 2019, at 12:34 a.m. CDT (or 11:34 p.m. MDT), RCPE received via email from SkyGuard-AccuWeather a flash flood warning for an area that encompassed the incident location. (Doc. 56-11). The "Flash Flood" email, "WARNING 8196," was sent with "High" importance to RCPE. (Doc. 56-11). The flash flood warning was relevant to mile markers 606.5 to 628.1 which encompassed the derailment site (roughly at mile 622.75) and was indicated in the email to begin on Friday, August 2, 2019, at 12:34 a.m. CDT (or 11:34 p.m. MDT) and expire later that day at 5:00 a.m. CDT (or 4:00 a.m. MDT). (Doc. 56-11; 55, ¶ 37; 71, ¶ 37). The warning provided:

> Heavier rain is moving back into the area which has already seen 1.5-3 inches of rain over the last 3 hours. Look for an additional 1-2 inches to bring totals into the 2.5-5 inch range. Runoff will also move towards track from the north in this area, thus watch for high water near track, flash flood conditions, and potential washouts!

(Doc. 56-11).

### B. No storm patrol

"Storm patrol" is a railroad job in which workers "go out ahead of trains to make sure everything is okay for them to go over." (Doc. 55, ¶ 32) (citing Doc. 56-8, Hook Dep. at 35:4-11). Storm patrol can be performed by track inspectors, section foreman, or roadmasters, depending on availability. (Docs. 55, ¶ 32; 71, ¶ 32). Track inspectors learned that they should conduct storm patrol through the roadmaster or sometimes the dispatcher. (Docs. 55, ¶ 33; 71, ¶ 32; 70-2, Hook Dep. 38:17-22). Track inspector Jared Hook testified that if he knew there was a storm around, he would check in with his supervisors to see if he needed to do a storm patrol, but that on the night of the incident, he was not aware of a storm in the area. (Docs. 55, ¶ 33; 71, ¶ 33; 70-2, Hook Dep. 39:21-25). Hook testified that in Phillip, South Dakota, where he lived, they did not have any storms come through the area. (Doc. 70-2, Hook Dep. 40:1-8).

RCPE's dispatch and management made the decision whether to send out storm patrol inspectors based largely on automated weather alerts generated from a system called SkyGuard

2

(which is an AccuWeather product). (Docs. 55, ¶ 34; 71, ¶ 34). Michael Kellar, an assistant general manager and acting roadmaster at the time of the derailment, was questioned about how the SkyGuard warnings worked and how dispatch and other railroad personnel acted upon them:

> Q: And who provides the SkyGuard warnings?
>
> A: It's—it's an AccuWeather. And it gets sent to, like, our ARDC dispatch center. And then they'll either call, like, the roadmaster or somebody in charge and notify them of the storm coming through and generally put the trains down to, like, a restricted speed.
>
> Q: Anything else that's required when Accuview [sic] contacts dispatch and dispatch contacts the roadmaster?
>
> A: Generally the roadmaster will send out an inspector after the storm has passed to assess the area or anything that were to happen.
>
> Q: And until the storm passes, the trains are reduced in their speed? Is that how it works?
>
> A: It depends. There's different circumstances, such as if there was severe weather, like, tornado, we'd stop the train instantly, that type of thing. If it's weather related, flash flood-type instances and—we run them at restricted so that they can stop short of anything. Or we'll send an inspector to get a look on the track ahead of them.

(Docs. 55, ¶ 35; 71, ¶ 35).

Jared Hook, the track inspector for the relevant segment of track at the time of the derailment, testified that he did not get a call to do a storm patrol the evening of the derailment and that a track inspection was not performed until the next day after the derailment. (Docs. 55, ¶¶ 41, 43; 71, ¶¶ 41, 43).

### C. Plaintiff's work duty

In the early morning of Friday, August 2, 2019, Plaintiff Kenneth Petersen was working as a conductor for Defendant RCPE. (Docs. 55, ¶ 1; 71, ¶ 1). He was working on a two-person crew with engineer Michael Hendrickson, operating an eastbound train out of Rapid City. (Docs. 55, ¶ 1; 71, ¶ 1). Petersen and Hendrickson reported for duty on Friday, August 2, 2019, at 12:14 a.m. MDT, and at 1:00 a.m. MDT, they departed on the train eastbound from Rapid City. (Docs. 55, ¶ 2; 71, ¶ 2; 94, ¶ 2).

RCPE did not give Petersen and Hendrickson any notice of the SkyGuard/AccuWeather flash flood warning or heavy rains in the area prior to their departure, or at any time before the derailment. (Docs. 55, ¶¶ 3-4; 71, ¶¶ 3-4; 94, ¶¶ 3-4). It was not raining at the depot in Rapid City before Petersen and Hendrickson departed, and Hendrickson and Petersen did not experience rain after their departure until right before the derailment. (Doc. 56-1, Hendrickson Dep. 71:9-72:1).

### D. The derailment

Heavy rains had washed out the supporting ballast and ties at a culvert that ran underneath a section of track near New Underwood, South Dakota. (Docs. 55, ¶ 4; 71, ¶ 4). The washout meant that the track was left in place, but the earthworks and track supporting the rail were undermined by flowing surface runoff from the rains and significantly weakened. (Doc. 55, ¶ 4; 71, ¶ 4). The site of the washout and eventual derailment was "a descending hill" around mile post 622.75 where the train "come[s] around a corner towards the top of the hill and then you have . . . anywhere from [a] three-quarter to a one-mile stretch and then there's another curve," and the derailment location "is closer down to the bottom of the hill just before the curve." (Docs. 55, ¶ 5; 71, ¶ 5) (citing Doc. 56-1, Hendrickson Dep. 69:15-20; 72:5-8).

The train was traveling at 25 miles per hour, which was within the speed limit in that segment of the track. (Docs. 55, ¶ 6; 71, ¶ 6). Hendrickson was increasing speed out of the speed-limited section at the time of the derailment and estimated that his speed at the time of derailment was 28 to 30 miles per hour. (Docs. 55, ¶ 6; 71, ¶ 6). Up until immediately before the derailment, Hendrickson and Petersen did not notice anything out of the ordinary. (Docs. 55, ¶ 7; 71, ¶ 7). It was dark at the time, and Hendrickson testified that visibility from the locomotive headlights is generally limited to no more than a quarter mile. (Docs. 55, ¶ 7; 71, ¶ 7; 56-1, Hendrickson Dep. 74:4-20). About 200 to 250 yards away from the washout, Hendrickson first saw the hazard. (Docs. 55, ¶ 8; 71, ¶ 8). He had been looking down to monitor the gauges for a few seconds and saw the washout when he looked up. (Docs. 55, ¶ 8; 71, ¶ 8).

When he saw the washout, Hendrickson "cussed" and "grabbed the air brake handle" because he "knew it was the only thing [he] could do." (Docs. 55, ¶ 9; 71, ¶ 9). Hendrickson testified that he was unsure if he was able to brake the train at all before the derailment. (Docs. 55, ¶ 9; 71, ¶ 9). He "cussed and told [Petersen] to hold on." (Docs. 55, ¶ 9; 71, ¶ 9). Petersen also saw the washout shortly before the train derailed. (Docs. 55, ¶ 9; 71, ¶ 9).

When the lead locomotive passed over the washout area just before 3:00 a.m. MDT, it derailed. (Docs. 55, ¶ 10; 71, ¶ 10). Anthony White, the sheriff's deputy who was the first responder on the scene, testified that it appeared that the train crossed the gap where there was no longer a track bed, listed to its right side and impacted the bank on the far side. (Docs. 55, ¶ 10; 71, ¶ 10). When the locomotive hit the washout, Hendrickson recalled:

> All I remember is the first bang. I felt the nose drop and like slam into the other side of the wash, I guess. And then I remember—from there I remember kind of rising up and going on our side and then the second—the second that it slammed into the ground. And that's all I really remember about it.

(Docs. 55, ¶ 11; 71, ¶ 11). The lead locomotive in which Hendrickson and Petersen were working derailed and travelled about 300 yards and tipped onto its right side. (Docs. 55, ¶ 12; 71, ¶ 12).

Petersen was thrown from his chair and was trapped in the locomotive for around four hours until he could be removed by rescue workers. (Docs. 55, ¶ 14; 71, ¶ 14; 94, ¶ 14; 56-1, Hendrickson Dep. 100:11-17; 56-16, Petersen Dep. 78:19-22). Petersen was eventually removed from the locomotive and taken by ambulance to a hospital, where he was diagnosed with lacerations and cracked ribs. (Docs. 55, ¶ 15; 71, ¶ 15).

### E. The incident location after the derailment

A local resident, Gary Howie, arrived on the scene shortly after the derailment and photographed the derailment and the water at the site. (Docs. 55, ¶ 19; 71, ¶ 19). A sheriff deputy, Anthony White, was the first emergency responder on the scene. (Docs. 55, ¶ 20; 71, ¶ 20). Deputy White described the derailment site as follows:

> When I got to where the actual crash site was there was no ballast. There was metal rails that were spanning this large gap, I would say probably 50 to 80 yards wide. The rails were connected from the left or from one end to the other, and then there were intermittent railroad ties still attached to the rails that spanned that gap. But the actual track bed or ballast, as you would say, was completely gone.

(Docs. 55, ¶ 20; 71, ¶ 20). Deputy White described the water situation at the derailment site:

> So the track bed itself kind of acted as sort of like a dam for a drainage field to the north of it. There was a single culvert that went underneath the track bed that accessed Box Elder Creek, which is one of the main flowing creeks in the area. From what I could tell, that north field had received so much water so fast that as it was rushing out the single culvert into Box Elder Creek, the area around the culvert

> just kind of washed out to the point where it just took the entire track bed with it. So all the water was flowing from the north going south, and then the creek itself was flowing from east to west. So it was kind of like in the middle of a T by where this water was flowing and that's right where this crash had occurred.

(Docs. 55, ¶ 21; 71, ¶ 21). After the derailment, Deputy White said: "The culvert was completely gone. There was no culvert. It wasn't until I looked at satellite photos that I was able to kind of figure out what had been there prior to my arrival." (Docs. 55, ¶ 22; 71, ¶ 22).

A piece of the existing culvert was damaged and removed during the remediation of the site. (Docs. 55, ¶ 25; 71, ¶ 25). During an inspection of the site, approximately 3.5 years after the incident, Petersen's railway engineering expert, Brian Hansen, asked to look at the piece of the culvert that was taken out and was told by the roadmaster "that they had gotten rid of it." (Docs. 55, ¶ 25; 71, ¶ 25).

## DISCUSSION

Pending before the Court is a motion for partial summary judgment filed by Plaintiff, a cross-motion for summary judgment filed by RCPE, and Plaintiff's Motion for Sanctions. The Court will address each motion in turn.

### I. Summary Judgment Motions
#### A. Summary Judgment Standard

When cross-motions for summary judgment are presented to the Court, the standard summary judgment principles apply with equal force. *Wright v. Keokuk County Health Center*, 399 F.Supp.2d 938, 945-46 (S.D. Iowa 2005). Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet this burden, the moving party must identify those portions of the record which demonstrate the absence of a genuine issue of material fact, or must show that the nonmoving party has failed to present evidence to support an element of the nonmovant's case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party has met this burden, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir.2005) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)).

"[T]he mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . .Instead, the dispute must be outcome determinative under prevailing law." *Id.* at 910-11 (citation omitted).

"The filing of cross-motions does not concede the absence of a triable issue of fact. The court is bound in such cases to deny both motions if it finds . . . there is actually a genuine issue of material fact." *Jacobson v. Md. Cas. Co.*, 336 F.2d 72, 75 (8th Cir. 1964). When faced with cross-motions for summary judgment, the normal course for the trial court is to "consider each motion separately, drawing inferences against each movant in turn." *EEOC v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 603 n.8 (1st Cir. 1995); *see also Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

### B. FELA

Plaintiff brought an action for damages arising out of this incident under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51-60. FELA provides that a railroad is liable "for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, . . . or other equipment." 45 U.S.C. § 51.

Under FELA, an employer has a duty to provide its employees with a reasonably safe workplace. *Peyton*, 962 F.2d at 833 (8th Cir. 1992). "[A] relaxed standard of causation applies under FELA." *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994). If an employee is injured because of an unsafe condition, the employer is liable "if its negligence played any part, even the slightest, in producing the employee's injury." *Peyton*, 962 F.2d at 833; *see also Gottshall*, 512 U.S. at 543. The burden remains on the employee, however, to show the employer was negligent. *Peyton*, 962 F.2d at 833. FELA is not a worker's compensation statute, and the basis of liability is "negligence, not the fact that injuries occur." *Gottshall*, 512 U.S. at 543.

"Under FELA, an employer's 'fault may consist of a breach of the duty of care . . . or of a breach of some statutory duty.'" *Miller v. Union Pac. R.R. Co.*, 972 F.3d 979, 984 (8th Cir. 2020) (quoting *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 432 (1958)). An employer's duty of care in a FELA action turns in a general sense on the reasonable foreseeability of harm. *Ackley v. Chicago & N. Western Transp. Co.*, 820 F.2d 263, 267 (8th Cir. 1987) (citing *Gallick v. Baltimore & O.*

7

*R.R.*, 372 U.S. 108, 117 (1963)). An employer's conduct is measured by the degree of care that persons of ordinary, reasonable prudence would use under similar circumstances and by what these same persons would anticipate as resulting from a particular condition. *Id.* (citing *Gallick*, 372 U.S. at 118). An employer is not liable if it had no reasonable way of knowing about the hazard that caused the employee's injury. *Peyton*, 962 F.2d 832, 833-34 (8th Cir. 1992).

If a plaintiff proves a railroad violated a statutory or regulatory duty, "proof of such violations is effective to show negligence as a matter of law" "even if the injuries sustained were not a type that the relevant statute sought to prevent." *Urie v. Thompson*, 337 U.S. 163, 189 (1949); *Gottshall*, 512 U.S. at 543. In such a case, "only causal relation is in issue." *Carter v. Atlanta & St. Andrews Bay Ry. Co.*, 338 U.S. 430, 434 (1949); *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 432-33 (1958).

One source of a railroad's statutory duties comes from the Federal Railroad Safety Act. *Walls v. Union Pac. R.R. Co.*, Civ. No. 8:20-413, 2022 WL 2905738, at *3 (D. Neb. Jul. 22, 2022). Regulations promulgated by the Federal Railroad Administration are considered safety statutes under the Federal Railroad Safety Act, and therefore violation of an FRA regulation constitutes negligence per se under FELA. *Id.* (citing cases).

### C. Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for summary judgment on liability, arguing that Defendant is negligent per se for violating federal regulations requiring that a railroad track must be support by material called ballast that provides adequate drainage for the track, 49 C.F.R. § 213.103, and for violating regulations relating to special inspections, 49 C.F.R. § 213.239. (Doc. 54 at 619-20).

#### 1. Ballast/support material regulations

Federal regulations requires that railroad track must be supported by material (called "ballast" in the industry) that will:

(a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade:
(b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;
(c) Provide adequate drainage for the track; and
(d) Maintain proper track crosslevel, surface, and alignment

49 C.F.R. § 213.103. Plaintiff argues that there can be no dispute that RCPE violated section 213.103 on the morning of the derailment because "all witnesses with knowledge of the site were unanimous in describing the track at the derailment as washed out and unsupported by ballast." (Doc. 54 at 619). Plaintiff argues that "[t]here is no tenable argument that ballast able to be swept away by accumulated surface rainwater provided 'adequate drainage' to the track above." (Doc. 54 at 619).

RCPE argues that Plaintiff has not presented any evidence that RCPE had notice of the alleged track defect (lack of adequate drainage) prior to the derailment. (Doc. 70 at 2451). RCPE argues that Plaintiff has failed "to present any evidence of when the washout occurred relative to the incident, or any other evidence that would establish that the defect existed for sufficient time prior to the derailment such that RCPE should have discovered it." (Doc. 70 at 2452).

Unlike violations of other Federal Railroad Administration regulations that create strict liability when violated, track maintenance regulations require that a railroad have knowledge before it is liable for track maintenance failures. *See* Track Safety Standards, 63 FR 33992-01, 3395 (June 22, 1998) ("This knowledge standard is unique to the track regulations; other FRA regulations are based on strict liability."); 49 C.F.R. § 213.5(a) (requiring notice). The FRA's 1998 Track Safety Standards Final Rule, 63 Fed. Reg. 33,992-01 (Jun. 22, 1998), limits liability for track owners to "non-compliance or civil penalties for only those defects that they knew about or those that are so evident the railroad is deemed to have known about them." *Id.* at 33,995. The FRA's Final Rule says that this exception is unique to track safety standards because "railroads cannot prevent the occurrence of some defects in track structures that are continually changing in response to the loads imposed on them by traffic and effects of weather." *Id.* However, even when railroads have not uncovered a problem, they may be responsible for a defect that "is of the nature that it would have had to exist at the time of the railroad's last inspection (for example, defective crossties or certain breaks that are covered with rust) and would have been detected with the exercise of reasonable care." *Id.* at 33,996. The existence of a defect of this type "constitutes constructive knowledge by the railroad." *Id.*

The Court finds that a question of material fact exists as to whether RCPE had constructive knowledge prior to the derailment that the ballast of the track at the incident location failed to provide adequate drainage. On the one hand, track inspector Jared Hook testified that to his

9

knowledge, after the railroad installed tile drainage along the track in the mid-1990's, the track at the incident location had not experienced drainage issues. (Doc. 70-3, Hook Dep. 76:17-78:9). Hook testified that he inspected the section of the track where the derailment happened at least twice a week and testified to having last inspected that section on July 30, 2019—shortly before the derailment had occurred in the early morning hours of August 2, 2019. (Doc. 70-3, Hook Dep. 70:15-73:5, 78:10-16). There is no evidence in the record that during Hook's inspections leading up to the derailment, he had observed any drainage issues at the derailment location. In addition, Plaintiff, who had travelled on that section of the track approximately three to four times a week, testified that he had not witnessed any flooding along the track at the incident location. (Doc. 56-1, Hendrickson Dep. 68:18-69:23). Although Gary Howie, a neighbor who lived near the derailment site and frequented the site several times a week to follow cattle or to hunt, testified that he too had not witnessed water pooling up at the derailment site, in the record is a purported snapshot of Mr. Howie's Facebook page dated May 31, 2019, that appears to show water pooling up at the derailment site and the following post by Mr. Howie:

> A dam forming at the railroad tracks where the huge culverts are not big enough to take all of the water. This was several days ago, so crunch time is past without problems and the train is still running, albeit less frequently.

(Doc. 55, ¶ 18). Although RCPE objects to this evidence on hearsay grounds, the Court will consider it for purposes of summary judgment, finding that foundation for the exhibit could likely be established at trial. The Court is not the trier of fact and may not weigh evidence at this summary judgment stage. Whether or not RCPE had constructive notice that the ballast did not provide adequate drainage for the track at the derailment site is a question for the jury, and the Court declines to grant Plaintiff's Partial Motion for Summary Judgment on the basis that RCPE violated 49 C.F.R. § 213.103. *See Cowden v. BNSF Ry. Co.*, 975 F.Supp.2d 1005, 1018 (E.D. Mo. 2013) ("'[A]lthough § 213.103 provides the applicable standard of care, genuine disputes of material fact remain as to whether Defendant provided adequate ballast to properly support the track at issue."); *Ellenbecker v. BNSF Railway Co.*, Civ. No. 4:19-3038, 2021 WL 781384, at *13 (D. Neb. Mar. 1, 2021) ("Because genuine issues of material fact exist regarding both of Ellenbecker's negligence per se arguments, the plaintiff's partial motion for summary judgment on the issue of negligence will be denied.").

### 2. Weather-related special inspection regulation

Federal regulations provide that "[i]n the event of fire, flood, severe storm, or other occurrence which might have damaged track structure, a special inspection shall be made of the track involved as soon as possible after the occurrence and, if possible, before the operation of any train over that track." 49 C.F.R. 213.239.

RCPE points out that as evidence of a violation of 49 C.F.R. § 213.239, "Plaintiff describes the storm as severe and argues that RCPE should have inspected the track during the storm." (Doc. 70 at 2453). The Court finds that the plain language of the regulation does not support Plaintiff's position that 49 C.F.R. § 213.239 requires RCPE to perform a special inspection of the track during a storm or severe weather event and always before the operation of a train over the affected track. Title 49, Section 213.239 of the Code of Federal Regulations provides that "special inspection shall be made of the track involved *as soon as possible after* the occurrence." In addition, "the regulation provides that the special inspection *should occur before the operation of any train over the track, if possible*. The regulation does not specifically provide that the Defendant should have sent its track inspector ahead of the train. *See Indemnity Ins. Co. of N.A. v. BNSF Railway Co.*, Civ. No. 4:16-763, 2017 WL 5075929, at *7 (E.D. Tex. Sept. 29, 2017).

If it was "possible" to have a special inspection before the operation of the train over the tracks is a jury question. Accordingly, Plaintiff's Partial Motion for Summary Judgment is denied on the basis that RCPE violated 49 C.F.R. § 213.239 as a matter of law.

### D. RCPE's Motion for Summary Judgment

RCPE argues that because Plaintiff cannot claim that RCPE violated federal regulations relating to track inspection, "[t]his claim fails as a matter of law, and th[e] Court should grant summary judgment in favor of RCPE." (Doc. 70 at 2454). Even if Plaintiff is unable to establish as a matter of law strict liability based on a violation of a statute, Plaintiff may still prove at trial a common law negligence claim. Such a claim requires proof of duty, breach, causation and damages. *See Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 538 (1994). As stated above, an employee's duty of care in a FELA action turns on the reasonable foreseeability of the harm. *Ackley v. Chicago & N. Western Transp. Co.*, 820 F.2d 263, 267 (8th Cir. 1987).

With regard to foreseeability, the question to be determined is whether the carrier "fail[ed] to observe that degree of care which people of ordinary prudence and sagacity would use under the same or similar circumstances." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703 (2011). "A defendant's duty of care under FELA should be 'measured by what a reasonably prudent person would anticipate as resulting from a particular condition.'" *Cowden v. BNSF Ry Co.*, 690 F.3d 884, 896 (8th Cir. 2012) (quoting *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 118 (1963)). Thus, "an employer is not liable if it had no reasonable way of knowing about the hazard that caused the employee's injury." *Peyton v. St. Louis Southwestern Ry. Co.*, 962 F.2d 832, 833-34 (8th Cir. 1992). Provided that negligence is proved, no matter how insignificant its role in producing the injury, "the manner in which [the injury] occurred" need not be foreseeable. *Burckhard v. BNSF R.R. Co.*, 837 F.3d 848, 854 (8th Cir. 2016) (quoting *CSC Transp. Inc..* 564 U.S. at 703-04). Whether a railroad has reasonable grounds to foresee that a particular condition might result in an injury is a factual inquiry and depends on the evidence of each particular case. *Id.*

RCPE argues that Plaintiff has presented no evidence that based on the information known to RCPE, the washout of the tracks at the derailment location was reasonably foreseeable. (Doc. 70 at 2456). RCPE argues that there is no evidence that it knew or should have known that there was flash flooding in the area of the derailment, that the track had been washed out, or that it was otherwise unsafe for travel. RCPE notes that no real-time reports of flash flooding had been received by the National Weather Service or RCPE prior to the derailment. (Doc. 70 at 2454). RCPE also notes that no flash flood warnings covering the derailment site had been issued by the National Weather Service. (Doc. 70 at 2454). RCPE states that there is no evidence that in the years leading up to the derailment, the location had previously experienced flooding. (Doc. 70 at 2453). RCPE contends that these facts, combined with RCPE's expert opinion that this was a 100-200-year weather event, establishes as a matter of law that the track at the derailment site did not present an unreasonable risk of harm to Plaintiff.

The Court disagrees and finds that questions of material fact exist on this question. There is no question that RCPE had been placed on notice well before the derailment that the area was under threat of flooding. At 1:50 p.m. MDT on Wednesday, July 31, 2019, the National Weather Service Rapid City issued a Flash Flood Watch, including central Pennington County where the

derailment occurred, effective from Thursday afternoon to late Thursday night due to the threat of heavy rainfall. (Doc. 56-9). The Flash Flood Watch indicated that "abundant moisture combined with slow storm movement could produce very heavy rainfall and cause rivers and streams to rise quickly." (Doc. 56-9). On Thursday, August 2, 2019, around 10:41 p.m. MDT, the National Weather Service Rapid City issued a warning that "flash flooding was expected to begin shortly" in an area approximately 12.5 miles southeast of the incident site. (Doc. 56-9). A short time later, on Friday, August 2, 2019, at 12:34 a.m. CDT (or 11:34 p.m. MDT), RCPE received via email from SkyGuard-AccuWeather a flash flood warning for an area that encompassed the incident location. (Doc. 56-11). The "Flash Flood" email, "WARNING 8196," was sent with "High" importance to RCPE. (Doc. 56-11; 55, ¶ 37; 71, ¶ 37). The warning was relevant to mile markers 606.5 to 628.1 which encompassed the derailment site (roughly at mile 622.75) and was indicated in the email to begin on August 2, 2019, at 12:34 a.m. CDT (or 11:34 p.m. MDT) and expire later that day at 5:00 a.m. CDT (or 4:00 a.m. MDT). (Doc. 56-11). The warning provided:

> Heavier rain is moving back into the area which has already seen 1.5-3 inches of rain over the last 3 hours. Look for an additional 1-2 inches to bring totals into the 2.5-5 inch range. Runoff will also move towards track from the north in this area, thus watch for high water near track, flash flood conditions, and potential washouts!

(Doc. 56-11). On August 2, 2019, around 1:00 a.m. MDT (after RCPE received the SkyGuard flash flood warning), Plaintiff departed on the train eastbound from Rapid City. The derailment occurred around 3:00 a.m. MDT.

The Court finds, contrary to the assertions made by RCPE, that a reasonable inference could be made that the SkyGuard-Accuweather email placed RCPE on notice that flash flooding was likely given the amount of rain that was reported to have fallen and was predicted yet to fall, and given that it warned that "runoff *will* also move towards the track from the north in this area," and may result in "high water near the track, flash flood conditions, and potential washouts." It is undisputed that RCPE did not halt Plaintiff's train, did not inform Plaintiff or Hendrickson of the flash flood warning, did not issue a slow order, and did not attempt to undertake an inspection of the 23 miles of track that was within the warning area. Jared Hook, the RCPE inspector assigned to that area of the track at the time, testified that in his opinion, "[t]here's no railroad in the country that would be able to take that kind of deluge and not have a washout or something happen." (Doc. 56-8, Hook Dep. 34:23-35:3). The Court concludes that a jury could reasonably find that RCPE

13

should have been aware of conditions that would make likely a track washing out and Plaintiff's train derailing, that RCPE "fail[ed] to observe that degree of care which people of ordinary prudence and sagacity would use under the same or similar circumstances," and that the breach of RCPE's duty of care "played a part—no matter how small—in bringing about the injury." *See CSX Transp., Inc.*, 564 U.S. at 703.

## II.   Motion for Sanctions

Plaintiff moves for sanctions under Rule 37(e) of the Federal Rules of Civil Procedure and under the Court's inherent "ability to fashion an appropriate sanction for conduct [that] abuses the judicial process" on the basis that RCPE failed to preserve important evidence. (Doc. 54 at 631) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991)). Plaintiff argues that "RCPE did not systematically document the state of the culverts or track after the washout and derailment." (Doc. 54 at 632). Plaintiff also contends that sanctions are appropriate because a piece of the existing culvert that was damaged and removed during the remediation of the site was not preserved and was not available to Petersen's expert during his inspection. (Doc. 54 at 632). Plaintiff argues that "[a]n appropriate sanction for RCPE's [alleged] spoilation is a finding that the track structure was in violation of regulations, as well as any other sanction the Court deems reasonable and warranted in these circumstances." (Docs. 54 at 633). Plaintiff also contends that "no assumptions or inferences about the state of the culvert or derailment site should be made to benefit RCPE, either at trial or as the moving party on this motion." (Doc. 54 at 633).

RCPE argues in opposition that sanctions are not warranted because Plaintiff has produced no evidence of bad faith by RCPE or prejudice to Plaintiff. (*See* Doc. 70 at 2457-58). RCPE states that it produced 135 photographs of the derailment scene, remediation invoices, various incident notifications and RCPE's report of the incident. (Doc. 70 at 2458). RCPE argues that Plaintiff has not identified with specificity anything that he believes should have been documented and was not, nor how Plaintiff was prejudiced thereby. (Doc. 70 at 2458). With regard to the damaged culvert section that was not retained, RCPE points out that the first time Plaintiff made any request to view this section of the culvert was over 3.5 years after the incident. (Doc. 70 at 2458). RCPE argues that Plaintiff "makes no attempt to explain how this piece of the culvert is important, what potentially would be learned from it, or how he has been prejudiced," nor "explain what he needed

to see with regard to the damaged culvert that is not viewable in photographs taken at the scene which were produced in this case, and which show the damaged culvert." (Doc. 70 at 2458).

The Court will analyze Plaintiff's motion for sanctions under its inherent authority rather than Rule 37 because the evidence at issue here does not consist of electronically stored information. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("The new rules applies only to electronically stored information . . . ."); *see also Pals v. Weekly*, Civ. No. 8:17-27, 2019 WL 7482263, at *3 (D. Neb. 2019) ("Rule 37(e) does not apply when the evidence lost or destroyed is not ESI. In those situations, a court must determine the sanctions available under its inherent authority.").

"A court's inherent power includes the discretionary 'ability to fashion an appropriate sanction for conduct which abuses the judicial process.'" *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 745 (8th Cir. 2004) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991)). Spoilation of evidence can constitute such an abuse. *Am. Nat'l Property & Casualty Co. v. Broan-Nutone, LLC*, Civ. No. 5:18-5250, 2020 WL 6380501, at *2 (W.D. Ark. Oct. 30, 2020) (citing *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir. 1993)). In *Stevenson v. Union Pacific R.R. Co.*, a case involving the alleged spoilation of evidence, the Eighth Circuit Court of Appeals held that before an adverse inference instruction is warranted, a district court is required to make two findings: (1) there must be a finding of intentional destruction indicating a desire to suppress the truth, and (2) there must be a finding of prejudice to the opposing party. *Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 460 (8th Cir. 2013) (citing *Stevenson*, 354 F.3d 739, 746, 748 (8th Cir. 2004)). A finding of bad faith and prejudice is also required when imposing a more severe sanction as Plaintiff requests in the present case—that of finding in favor of Plaintiff on liability. *See Menz v. New Holland N.A., Inc.*, 440 F.3d 1002, 1006 (8th Cir. 2006) (stating that it would unreasonable to excuse a finding of bad faith when imposing a sanction more severe than an adverse inference instruction at trial). "[W]hether the extent of a sanction is appropriate is a question peculiarly committed to the district court." *Dillon*, 986 F.2d at 268.

Prejudice may be shown by the nature of the evidence that was destroyed. *Stevenson*, 354 F.3d at 748. Prejudice exists when spoliation prohibits a party from presenting evidence that is relevant to its underlying case. *Vogt v. MEnD Correctional Care, PLLC*, Civ. No. 21-1055, 2023 WL 2414551, at *10 (D. Minn. Jan. 30, 2023). "There is no prejudice if there is no support for the

speculation that the destroyed evidence would have affected the litigation." *Merfeld v. Cometic Corp.*, 306 F.Supp.3d 1070, 1085 (N.D. Iowa 2018).

In *Merfeldt v. Domestic Corporation*, the plaintiffs brought a lawsuit for damage to personal property and a storage building allegedly caused by a defective refrigerator in the RV owned by the plaintiffs that was manufactured and sold by the defendant. 306 F.Supp.3d 1070 (N.D. Iowa 2018). Before a joint inspection by the parties of the building, the plaintiff performed clean-up of the site, and removed debris from the north, east and west sides of the building up to the area where the RV was located, and did some cleanup on the south side of the building as well. *Id.* at 1075. The defendant moved for dismissal based on spoilation of the evidence, arguing that its experts did not have the opportunity to examine potential alternative sources of origin for the fire other than the RV. *Id.* at 1083. Although the court found that there was no evidence of bad faith desire to suppress the truth by the plaintiff, the court did find that the defendant was prejudiced. *Id.* at 1806. Both parties agreed that disturbing a fire scene can compromise an investigation and the defendant's fire inspector stated in his report that testing of other possible fire origins was not possible due to the extent of cleaning. *Id.*

In *Stevenson v. Union Pac. R.R. Co.*, plaintiffs brought a negligence action against a railroad arising out of a grade crossing collision where the motorists' vehicle was hit by the train, injuring the driver and killing the passenger. 354 F.3d 739 (8th Cir. 2004). The plaintiffs brought a motion for sanctions due to the fact that the railroad had failed to preserve a contemporaneous recording of the conversations between the train crew and dispatchers on the date of the accident. *Id.* at 748. The court found prejudice to the plaintiff, finding that "the only contemporaneous recording of conversations at the time of the accident will always be highly relevant to potential litigation over the accident." *Id.*

Unlike in *Merfeldt* and *Stevenson*, here Plaintiff has provided no evidence that RCPE has failed to preserve any relevant evidence that may have affected the litigation. There seems to be no dispute that the train derailment occurred when it came across a section of track that had been washed out by the heavy rains. In addition to the photographs and other materials of the accident scene that Defendant states were provided to Plaintiff, Plaintiff was made aware that at the time of the derailment, there was one 96-inch culvert at the derailment site. (Doc. 55, ¶ 17). There is no indication in the record that an inspection of the culvert was necessary to determine the cause of

the washout. The parties agree that the culvert was unable to handle the amount of water flowing in that area during the early morning hours of August 2, 2019. Deputy White, the first emergency responder to the scene, described the derailment site as follows:

> When I got to where the actual crash site was there was no ballast. There was metal rails that were spanning this large gap, I would say probably 50 to 80 yards wide. The rails were connected from the left or from one end to the other, and then there were intermittent railroad ties still attached to the rails that spanned that gap. But the actual track bed or ballast, as you would say, was completely gone.

(Docs. 55, ¶ 20; 71, ¶ 20). Deputy White described the water situation at the derailment site:

> So the track bed itself kind of acted as sort of like a dam for a drainage field to the north of it. There was a single culvert that went underneath the track bed that accessed Box Elder Creek, which is one of the main flowing creeks in the area. From what I could tell, that north field had received so much water so fast that as it was rushing out the single culvert into Box Elder Creek, the area around the culvert just kind of washed out to the point where it just took the entire track bed with it. So all the water was flowing from the north going south, and then the creek itself was flowing from east to west. So it was kind of like in the middle of a T by where this water was flowing and that's right where this crash had occurred.

(Docs. 55, ¶ 21; 71, ¶ 21). Neither Plaintiff nor his experts has identified anything about the culvert or any piece of it that RCPE failed to preserve that would affect the litigation in this case, and further, Plaintiff has not provided any evidence that RCPE's failure to preserve a piece of the culvert was done intentionally and with a desire to suppress the truth. Accordingly, Plaintiff's Motion for Sanctions is denied.

IT IS HEREBY ORDERED:

1. That Plaintiffs' Motion for Partial Summary Judgment (Doc. 53) is DENIED;
2. That Defendant's Motion for Summary Judgment (Doc. 70) is DENIED;
3. That Plaintiffs' Motion for Sanction (Doc. 53) is DENIED.

Dated this 27th day of February, 2024.

BY THE COURT:

*[signature]*
Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

*[signature]*

17